CUTRER, Judge.
Charles Booksh sued under a written contract for an oil and gas production payment in the sum of $27,500.00. The owners of the land were joined as defendants. They are Dewey D. Angelloz and his twelve children who had inherited an interest from their mother, Arthur A. Angelloz *430 and his mineral assignees Paul and Charles Angelloz and Elizabeth Angelloz Perry. Merl D. Wiggins and James Lieux were joined as defendants on the ground that they were operators under a mineral lease granted by the other defendants. A recon-ventional demand was filed by the Angel-loz family for damages allegedly incurred by breach of contract by plaintiff. Wiggins and Lieux filed a reconventional demand for the cost of a bond allegedly issued to the buyer of their oil which bond was brought about by the filing of this suit. Wiggins and Lieux also filed a third paijty petition against the Angellozs seeking judgment against the Angellozs if judgment should be rendered against Wiggins and Lieux. From a judgment dismissing plaintiff’s suit, the reconventional demands and third party petition, the plaintiff and the Angellozs appeal. No reasons were assigned by the trial judge for his judgment.
The issue presented concerns the interpretation of the written contract entered into between plaintiff and Dewey and Arthur Angelloz. The contract entered into was dated August 8, 1959. The pertinent part of the contract reads as follows:
“THEREFORE, party of the first part does hereby and by these presents agree that for the consideration hereinafter recited he will rework said Angelloz Well No. 1 and, in connection with said reworking operations, he will furnish whatever rig or actual equipment needed to rework said oil well, and party of the second part agrees to furnish, in connection with said reworking operations, whatever material and supplies and equipment that might be necessary in connection therewith, with the exception of the actual workover equipment which is to be furnished by party of the first part.
The parties hereto understand and agree that the consideration for this contract shall consist of payment by party of the second part to party of the first part of the full sum of TWENTY-SEVEN THOUSAND FIVE HUNDRED AND NO/100 ($27,500.00) DOLLARS out of the first 3/32 of the whole of any oil or gas produced from the aforesaid Angel-loz No. 1.
The parties hereto understand and agree that this agreement or contract is specifically limited and' payment, as herein outlined, shall be made only from production resulting from the Angelloz No. 1. Said payments to continue from said Angelloz No. 1 until such time as party of the first part has received an oil payment amounting to TWENTY-SEVEN THOUSAND FIVE HUNDRED AND NO/100 ($27,500.00) DOLLARS, after which this contract shall expire.
The parties hereto further understand and agree that in the event the reworking operations herein provided for shall not result in successfully converting said oil well into a producer of oil or gas in paying quantities then, in that event, this contract shall terminate ipso facto, the same as if never entered into, and the responsibilities and obligations of both parties hereto shall end.
The parties further understand and agree that party of the first part, upon termination of this agreement for any reason whatsoever, or in the event said well is not successfully completed as a producer, shall have the right to remove from said property within a reasonable delay for drilling equipment placed thereon by him.”
LSA-C.C. Art. 1901 provides in part as follows:
“Agreements legally entered into have the effect of laws on those who have formed them.”
To ascertain the intention of the parties to the contract it is necessary to examine the circumstances surrounding the execution of the instrument.
During the year 1955 C. G. Glasscock Company drilled the well in question to a *431 depth below 9700 feet. This company set 51/2 inch casing in the well. In an attempt to squeeze cement behind the casing, Glass-cock found the casing partially collapsed at a depth of 9544 feet. This company cemented the bottom of the well and moved off. During the months of May and June of 1959 Merl D. Wiggins and James R. Pertuit performed certain operations on the well in an attempt to make it a producer. These operations were carried out with a rig furnished by plaintiff. During the course of those operations, plaintiff testified that he “milled out” of the casing at a depth of 9631. This means that a hole was cut in the casing allowing the milling tool to go outside the casing into formation. Sand recovered from the milling tool showed oil. Financial difficulties arose and completion was not accomplished. Subsequently and before entering into the contract in question plaintiff testified that he discussed the mechanical condition and production possibilities of the well with the Angellozs. Plaintiff’s testimony in this respect is as follows:
“Q. Now, Mr. Booksh, I have just a few questions that I want to ask you, and the first one deals with — to set your thinking back to the first time you discussed this liner with the Angelloz. Did you — I believe your testimony was this morning that you recommended to the Angelloz that they set a liner—
A. Right.
Q. —before they ever started anything here—
A. Right.
Q. —and that they refused ?
A. Well, they said that they’d go on along and — and produce the open hole like it was.
Q. Well, did you in your experience in the oil field believe that you could make a successful open hole completion?
A. In my experience I had never done it, but before my time they flowed — they flowed many an oil well in the open hole. That’s why I told him what I did, that it might sand up for six days or six weeks or six months. It ain’t no telling when.
Q. But in your experience you had never attempted to make an open hole completion on a well at this depth?
A. No.
Q. Well, how is it regarded in the industry, an attempt to make an open hole completion at ninety-five or ninety-six hundred feet?
A. Well, just like I just got through saying, in my time they — the ones that I worked for never had.
Q. They don’t do it?
A. No. They set casing all the way down and perforate it. That was the purpose of running the liner to where you would have casing all the way down.
Q. But you were perfectly willing to attempt to complete this well open hole at that depth?
A. That was their wishes; so I went along with them.”
Plaintiff’s brother, Fred Booksh, who was toolpusher for plaintiff during this period, testified that he was present when the pre-contract discussion took place. In this regard, he testified as follows:
“Q. Mr. Booksh, you were with your brother at the time you discussed the reworking of this well with the Angelloz?
A. Yes, sir.
Q. And was there a discussion about a liner with the Angelloz at that time?
A. Yes, sir.
Q. Did you and your brother recommend that a liner be installed prior to the execution of the contract between your brother and the Angelloz?
A. Yes, sir.
*432 Q. Who made that recommendation, you or your brother ?
A. Well, we had talked about it before we talked to the Angelloz.
Q. And you had concluded it was necessary to install a liner or that it would be better to install a liner in that well?
A. That it would be better, right.
Q. How did you arrive at that conclusion; what made you think that?
A. Well, because you had got to have some way to shut off the sand and salt water.”
******
“Q. Well, why did you suggest a liner in this particular well at that time?
A. Because it was a very, very soft sand.
Q. How did you know that ?
A. Because we pulled a core out of it.
Q. You had already worked on this well, is that correct?
A. Right, sir.
Q. And for whom had you worked on the well prior to August of 1959?
A. Wiggins Oil Tools.
Q. And had you assisted your brother in that operation?
A. Yes sir. I was the toolpusher on the job.”
After this discussion, the contract was executed. The plaintiff moved his rig into the location and rigged up on or about August 7, 1959. The plaintiff then proceeded to run 2]/2 inch tubing into the hole with a packer spaced so that it would be above the defective place in the casing located at a depth of 9544 feet. This was the “open hole” setting referred to in plaintiff’s testimony supra. The mud was displaced by water, a Christmas tree installed and the well began to produce oil and some salt water on August 9, 1959. The well was allowed to flow into pits for a few days producing approximately 70 to 80 barrels of oil per day through a %4 inch choke. The well began sanding up and was dead by August 16. None of this oil was ever treated or sold. Plaintiff moved his rig off and installed a swabbing unit in an attempt to clean the sand out of the tubing. This operation failed when the swab line was pulled apart and the sinker bars were left in the tubing. This ended plaintiff’s operations on this well.
Plaintiff subsequently discussed with the Angellozs, the possibility of going back into the well to clean it out and set a “liner type” of completion. He offered to do this for the cost of his labor, fuel and taxes or $500.00 per day for each day of operation. This offer was refused by the Angel-lozs. They were not willing to risk this expense.
In October and November of 1964 Wiggins and Lieux, after obtaining a mineral lease from the Angellozs, moved a rig on the well, cleaned it out, “milled out” and drilled from 9531 to 9680, performed a “liner setting” complete with cementing and perforation procedures, thereby making a producer which produced in paying quantities up until the time of trial.
We reiterate this detailed history and testimony to show that plaintiff was well acquainted with the well before entering into the contract. He was aware of the mechanical defects. He was an experienced oil man. He signed the agreement with the full knowledge that the Angellozs did not desire to risk the expense of a “liner type” of completion. Plaintiff was well aware of the hazards and risks of an “open hole” setting and that this type of setting is not practiced in the oil industry. He entered into the contract knowing that this was the type of completion procedure to be used on the well. As testified to by plaintiff and his brother, this type completion could easily offer sanding and salt water problems and that it was very prob *433 lematical whether it would produce six days, six weeks or six months. It produced approximately six days before sanding up. This failure was due to the method of completion, and when this failure took place, the contract terminated of its own terms ipso facto. The reworking operations did “not result in successfully converting said oil well into a producer of oil and gas in paying quantities” within the intention of the parties to the contract. The trial court was correct in dismissing plaintiff’s suit.
No brief was filed nor appearance made by counsel for the Angellozs. No appeal was perfected by counsel for Wiggins and Lieux. The reconventional demands and third party petition of these parties shall be dismissed. For the reasons set forth herein, judgment is affirmed. Plaintiff is to pay the costs of this appeal.
Affirmed.